UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ROTEX GLOBAL, LLC, | : | Case No. 1:16-cv-244 |
| | : | |
| Plaintiff, | : | |
| | : | Judge Timothy S. Black |
| v. | : | |
| | : | |
| CPI WIRECLOTH & SCREENS, INC., | : | |
| | : | |
| Defendant. | : | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS (Doc. 14)**

This civil action is before the Court on Defendant CPI Wirecloth & Screens, Inc.'s motion to dismiss (Doc. 14) and the parties' responsive memoranda. (Docs. 15, 16).

### I.    FACTS <u>AS ALLEGED</u> BY PLAINTIFFS

For purposes of this motion to dismiss, the Court must: (1) view the complaint in the light most favorable to Plaintiff; and (2) take all well-pleaded factual allegations as true. *Tackett v. M & G Polymers,* 561 F.3d 478, 488 (6th Cir. 2009).

Plaintiff Rotex Global, LLC ("Rotex") has been in business since 1844, is in the business of developing dry material screening equipment and technology, and is based in Cincinnati, Ohio. (Doc. 1, ¶12). The manufacture and distribution of screening equipment is an important part of Plaintiff's business. (*Id.* at ¶13). Defendant CPI Wirecloth & Screens, Inc. ("CPI") is a manufacturer and distributer of wire cloths and screens and operates in Texas and Louisiana. (*Id.* at ¶14).

1

A. The Manufacturing Agreement

On November 10, 2004, Rotex and CPI entered into a Manufacturing Agreement (the "Agreement"). (Doc. 1, Ex. A). The Agreement specifies that Rotex manufactures, markets, and sells in its own name material separators (*e.g.*, grain, pulp) and various assemblies, parts, accessories, and components. (*Id.*). Pursuant to the Agreement, the parties agreed that CPI would manufacture for Rotex and ship to Rotex customers these Rotex products. (Doc. 1, Ex. A). Defendant would manufacture screens for Rotex's products using Rotex's specifications and trade secret information and drop ship those screens directly to Rotex's customers. (Doc. 1, ¶15).

Rotex alleges that it was and is important to Rotex that CPI not compete in certain ways for a period of two years after the termination of the Agreement, so that Rotex would have the ability to continue growing its screen manufacturing and technology business. (*Id.* at ¶¶18-19). Further, it was and is important to Rotex that its confidential trade secret information be protected, including information regarding (a) the manufacture of screens and screen technology, (b) its customer lists, and (c) its customers and their preferences. (*Id.* at ¶¶18-19).

The Agreement contained certain restrictive covenants. Section 9 of the Agreement provides, in pertinent part:

> (a) Vendor agrees that during the Term of this Agreement and for a period of five (5) years after the termination of this Agreement, Vendor (i) shall not, directly or indirectly, through an affiliate or otherwise, manufacture, distribute, service or sell products which are competitive with the Products made or distributed by Rotex, or render services in any capacity to, or own any interest as an individual owner, stockholder, partner, member or in any other manner, in any person, firm, corporation, limited liability company,

2

>
> partnership or other entity which is, or engages in, a business that competes with Rotex; and (ii) shall refrain from developing, distributing, selling, or manufacturing any products which are competitive with the Products made or distributed by Rotex that could be manufacturing any products which are competitive with the products made or distributed by Rotex that could be manufactured from the know-how developed during the Term of this Agreement.
> . . . .
> (c) During the Term of this Agreement and for a period of two (2) years after termination of this Agreement, Vendor shall not, without the prior written consent of Rotex, which consent shall not be unreasonably denied, directly or indirectly, solicit or initiate contact with any individuals that are customers of Rotex.

(Doc. 1 at ¶ 20, Ex. A at § 9).

The Agreement also included a Covenant Not to Disclose Confidential Information, which contained a trade secret provision. (Doc. 1, ¶ 24). Pursuant to the Covenant Not to Disclose Confidential Information, CPI agreed "[d]uring the term of [the] Agreement and continuing thereafter . . . to receive and use its reasonable efforts to maintain the confidentiality of all Confidential Information disclosed to it by Rotex." "Confidential Information" was defined as follows:

> As used herein, "Confidential Information " means and includes: (i) all know how, technical data, designs, drawings, specifications, catalogs, data sheets, sales and technical bulletins, service manuals, customer lists, and customer contact information relating to the design, manufacture, or distribution of products, (ii) all other information, whether or not reduced to writing, relating to the design, manufacture or distribution of Products, as well as (iii) any other information relating to the business of Rotex that may be divulged to Vendor that is not generally known in the trade.

(*Id.* at ¶ 25, Ex. A at § 8).

3

The Parties entered into the Agreement for an initial term of one year. (Doc. 1 at ¶ 38).[1] The Agreement automatically renewed each year for an additional one-year term unless either party provided written notice of its intention not to renew at least ninety-days prior to the expiration of a either the initial term or a renewal term. (*Id.* at ¶ 39). Rotex alleges that the parties also entered into an Addendum to the Agreement in 2005. (*Id.* at ¶ 34). The Addendum added several provisions and modified the term of the Agreement. (*Id.* at ¶ 35). The Addendum also clarified and enhanced the restrictive covenants. (*Id.* at ¶ 36). On May 15, 2014, CPI wrote Rotex terminating the Agreement. (*Id.* at ¶ 40).

B. Alleged Breaches of the Agreement

Rotex alleges that CPI breached, and continues to breach, the Agreement in multiple ways. Rotex alleges that CPI has been soliciting Rotex customers, contrary to the restrictive covenants of the Agreement. (Doc. 1, at ¶ 43). Moreover, according to Rotex, CPI bid against Rotex on a major project for a substantial customer of Rotex, and CPI has reached the final stage of the selection process to the exclusion of Rotex, resulting in a seven-figure loss in revenue to Rotex. (*Id.* at ¶ 44).

Rotex alleges that CPI has also misappropriated confidential trade secret information. (*Id.* at ¶ 45). Specifically, CPI received confidential trade secret

---

[1] An indemnity and attorneys' fees provision was also included in the Agreement. (*Id*. at ¶ 29). In that provision, CPI agreed to defend, indemnify and hold harmless Rotex from and against all claims, actions, proceedings, loss, liability, damages, and expenses (including attorneys' fees) incurred by Rotex arising out of or related to (a) any breach of CPI's representations, warranties and covenants in the Agreement, the Purchase Order, or otherwise and (b) any actual or alleged infringement of any patent or trade secret used in production of any Product, except to the extent that the process or product alleged to infringe was specified by Rotex for use by CPI in production of the Product. (Doc. 1 at ¶ 30; Ex. A at § 5).

4

information of Rotex regarding (a) the manufacture of screens and screen technology, (b) its customer lists, and (c) its customer information. (*Id.* at ¶ 64).

Starting in June 2014, Rotex reminded CPI of its contractual and legal obligations in writing on multiple occasions, warning CPI not to breach those obligations. (*Id.* at ¶ 46). Rotex also repeatedly asked CPI to disclose any prohibited contacts with Rotex customers, but CPI allegedly delayed, evaded, and avoided responding to Rotex's inquiries. (*Id.* at ¶ 47). On January 14, 2016, after several inquiries from Rotex, CPI admitted that it is, in fact, in a bidding process with the Rotex customer referenced above. (*Id.* at ¶ 48).

Rotex alleges that these breaches have caused and continue to cause Rotex substantial damages, including to its goodwill, intellectual property, and sales. (*Id.* at ¶ 49). Rotex asserts claims for breach of contract, misappropriation of trade secrets, attorneys' fees, unjust enrichment, and tortious interference with a business relationship.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Moreover, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

5

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. 544 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (*citing Twombly*, 550 U.S. at 555). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]'- 'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id.* (citing Fed. Rule Civ. Proc. 8(a)(2)).

### III.   ANALYSIS

A.   Meeting of the Minds

CPI contends that Rotex's own allegations demonstrate that it cannot prevail in enforcing essential terms of the Agreement. CPI points to Rotex's allegation that a subsequent Addendum "clarified and enhanced the CPI restrictive covenants," and CPI

6

maintains that this allegation is tantamount to an admission that there was no meeting of the minds regarding essential terms of the Agreement.  CPI further contends that the essential terms of the Agreement are vague, indefinite and uncertain.  Thus, according to CPI, the Agreement is unenforceable.

Contracts are only enforceable if there "is a meeting of the minds as to essential terms" and the contract is "definitive and certain."  *Rayess v. Educ. Comm'n for Foreign Med. Graduates*, 983 N.E.2d 1267, 1271-72 (Ohio 2012) (citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 575 N.E.2d 134, 137 (Ohio 1991). Further, "[v]agueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement" result in an unenforceable agreement. *Riordan's Sporting Goods, Inc. v. Riordan's Sports & Equip., LLC*, 2003 WL 21689860, at *2 (Ohio App. 11th Dist. July 18, 2003).

Here, Plaintiff does allege that the Addendum "clarified and enhanced the CPI restrictive convenants, with CPI committing that it would not 'solicit, or honor quote requests, for Rotex screens from any customer not listed on the 'grandfather list.'"  (Doc. 1 at ¶ 36).  However, the Court is not convinced that this allegation conclusively establishes that there was no meeting of the minds as to the essential terms of the Agreement.  Indeed, CPI does not offer any authority in support of this position.  Moreover, the Court agrees with Rotex that parties often negotiate modifications and addendums, but if those efforts are unsuccessful, they do not necessarily eradicate the original binding agreement.   *See, e.g., Fairview Radiology, P.C. v. Defiance Hosp., Inc.*, 413 F. Supp. 2d 874, 883 (N.D. Ohio 2005) (a new written agreement does not "render

7

the previous agreement unenforceable if there is no acceptance of the subsequent agreement.").

In addition, the issue of whether there is a meeting of the minds is typically a question of fact. *Advance Sign Grp., LLC v. Optec Displays, Inc.*, 722 F.3d 778, 784 (6th Cir. 2013); *Fairview Radiology*, 413 F. Supp. 2d at 883 ("whether there was a meeting of the minds and whether the Agreement contains definite terms is at least a question of fact."). Further, if a contract term "cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term." *Davis v. Loopco Industries, Inc*., 609 N.E.2d 144, 145 (Ohio 1993). If a contract is ambiguous, the court can look "to the parties' mutual understanding, the custom and practice in the trade or community, or other established legal principles." *Standen v. Smith*, 2002 WL 242105, at *6 (Ohio App. 9th Dist. Feb. 20, 2002). Parol evidence is also admissible to clarify ambiguous language in a contract. *Pay(q)r, LLC v. Sibble*, No. 5:15cv1038, 2015 WL 9583034, at *11 (N.D. Ohio Dec. 31, 2015) (citing *Academic Imaging, LLC v. Soterion Corp.*, 352 F. App'x 59, 65 (6th Cir. 2009)).

Rotex has alleged a detailed, written Agreement with multiple terms signed by the parties. Rotex has further alleged that the Agreement was renewed annually from 2005 through 2013. Considering the facts in the light most favorable to Rotex, Rotex has alleged sufficient facts to support a finding that there was a meeting of the minds as to the essential terms of the contract. And although CPI raises arguments regarding vagueness and ambiguity of the terms of the agreement, those arguments do not establish a proper

basis for dismissal at this stage in the litigation. Instead, they require factual inquiries inappropriate at this juncture.

      B.      The Restrictive Covenants

CPI argues that the restrictions contained within the non-solicitation clause are unenforceable as a matter of law, and thus Counts I through IV should be dismissed as being related to allegedly unenforceable restraints on trade. According to CPI, Rotex failed to plead any fact that these terms operate as a reasonable restraint of trade. Further, CPI maintains that the terms are so overbroad as to ban all competition everywhere in the world, and to ban contact with Rotex customers with whom CPI does not even know exist.

"Noncompetition and nonsolicitation agreements that are reasonable are enforced, and those that are unreasonable are enforced to the extent necessary" to protect a business's legitimate interests. *Century Business Servs., Inc. v. Urban*, 900 N.E.2d 1048, 1053 (Ohio App. 8th Dist. 2008) (citing *Raimonde v. Van Vlerah*, 325 N.E.2d 544 (Ohio 1975) at paragraph one of the syllabus). Such covenants are reasonable if the restraint is no greater than is required for the protection of a legitimate business interest, does not impose undue hardship to the bound party, and is not injurious to the public. *Century Business Servs., Inc.*, 900 N.E.2d at 1056.

In determining whether restrictive covenants should be enforced, the facts of each case are paramount. *Id.* (citing *Raimonde*, 325 N.E.2d at 547). Moreover, courts are empowered to modify or amend agreements to achieve a reasonable covenant between the parties. *Id.* In doing so, courts may consider numerous factors, such as the absence

9

or presence of time and space limitations, whether the bound party is possessed with confidential information or trade secrets, whether the covenant seeks to eliminate unfair competition versus ordinary competition; and whether the covenant seeks to stifle the inherent skill and experience of the bound party. *Century Business Servs., Inc.*, 900 N.E.2d at 1053 (citing *Raimonde*, 325 N.E.2d at 547).

Rotex contends that, at this stage, the Court does not have the necessary factual record to adequately consider these factors. Moreover, according to Rotex, even if the Court found that the restrictions were unreasonable, the Court has the power to modify restrictive covenants. The Court agrees. At this stage, the Court does not have the information necessary to adequately assess the factors to determine whether the restrictions are reasonable. Thus, the Court declines to determine the enforceability of the restrictive covenants until the parties have had an adequate opportunity to develop a factual record.

C. The Addendum

CPI argues that Rotex's claims should be dismissed to the extent that they rely on an undated, unexecuted Addendum to the Agreement. CPI maintains that the Addendum fails as an enforceable and valid modification to the Agreement.

Pursuant to the Agreement, "[n]o alteration, variation, modification, or waiver of any of the terms and conditions of this Agreement shall be of any effect unless made in writing and signed by the duly authorized representatives of both parties." Here, the Addendum is not "signed by the duly authorized representatives of both parties." Rotex concedes this point, noting that it has not located an Addendum signed by both parties.

10

(Doc. 15 at 1). Rotex further notes that it therefore "withdraws its breach of contract claim as to the Addendum and consents to the dismissal of any Addendum-based claims without prejudice." (*Id.* at 2).

Accordingly, any breach of contract claims based solely on the Addendum are dismissed.

D.  Claims based on Alleged Misappropriation of Trade Secrets

CPI contends that dismissal of Rotex's claims based on improper use of confidential trade secrets is appropriate because Rotex pleads no facts regarding what specific trade secret that Rotex disclosed to CPI or that CPI misappropriated. Thus, CPI maintains, it cannot ascertain what information it allegedly used improperly. CPI further contends that Rotex's inclusion of allegations with the qualifier "subject to a reasonable opportunity for investigation and discovery" demonstrates that the allegations are simply a speculative fishing expedition. (Doc. 1 at ¶¶ 45, 57).

"The elements of a claim for misappropriation of trade secrets are: (1) the existence of a trade secret; (2) acquisition of the trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Kuvedina, LLC v. Cognizant Tech. Sols.*, 946 F. Supp. 2d 749, 755 (S.D. Ohio 2013) (denying motion to dismiss where plaintiff listed categories of information that it claimed to be trade secrets).

Here, Rotex sets forth numerous allegations about its trade secrets, including the contractual description of Rotex's confidential information in the Manufacturing Agreement. Pursuant to the Agreement, CPI agreed that:

11

> "Confidential Information " means and includes: (i) all know how, technical data, designs, drawings, specifications, catalogs, data sheets, sales and technical bulletins, service manuals, customer lists, and customer contact information relating to the design, manufacture, or distribution of products, (ii) all other information, whether or not reduced to writing, relating to the design, manufacture or distribution of Products, as well as (iii) any other information relating to the business of Rotex that may be divulged to Vendor that is not generally known in the trade.

Rotex further alleges CPI received confidential trade secret information, including regarding (a) the manufacture of screens and screen technology, (b) its customer lists, and (c) its customers and their preferences. (Doc. 1 at ¶ 64). Rotex also alleges that CPI agreed that all such confidential information was to be protected, but has used that confidential trade secret information in an improper manner not contemplated by Rotex. (*Id.* at ¶ 65). In addition, Rotex alleges that CPI has been soliciting Rotex customers, contrary to the restrictive covenants of the Agreement. (*Id.* at ¶ 43). Rotex further alleges that CPI bid against it on a major project for a substantial customer of Rotex. (*Id.* at ¶ 44).

The Court finds that these allegations satisfy the pleading requirements for asserting a plausible trade secrets claim. Plaintiff's use of the disclaimer "subject to a reasonable opportunity for investigation and discovery" does not compel a different conclusion. Such language is expressly authorized by Rule 11(b)(3), allowing pleadings alleging that the factual contentions, if specifically so identified, will likely have evidentiary support "after a reasonable opportunity for further investigation or discovery." As the 1993 Advisory Committee Notes to the Federal Rules provide, "[t]he certification with respect to allegations and other factual contentions is revised in

recognition that sometimes a litigant may have good reason to believe that a fact is true or false but may need discovery, formal or informal, from opposing parties or third persons to gather and confirm the evidentiary basis for the allegation."[2] Thus, at this stage, this language does not warrant dismissal of Rotex's claims based on CPI's alleged misappropriation of trade secrets.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons, Defendant's motion to dismiss (Doc. 14) is **GRANTED IN PART** and **DENIED IN PART** as set forth in this Order. Specifically, the Court dismisses all breach of contract claims based solely on the Addendum. Defendant's motion is denied in all other respects.

**IT IS SO ORDERED**.

Date:  2/29/16                                                                 *s/ Timothy S. Black*
                                                                               Timothy S. Black
                                                                               United States District Judge

---

[2] The Court further notes, however, that "if evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.